24-1092 Energy Harbor, LLC Petitioner v. FEDERAL ENERGY REGULATORY COMMISSION Ms. Wu for the Petitioner, Mr. Kennedy for the Respondent, Mr. Suarez for Intervenor, PJM Interconnection, LLC Good morning, Ms. Wu, you may proceed when you're ready. Good morning, Your Honor, may it please the Court. My name is Pamela Wu, I'm with the law firm Morgan Lewis & Bacchus, and I'm here on behalf of the Petitioner, Energy Harbor, LLC. I would like to reserve two minutes for rebuttal, thank you. The heart of this dispute is whether it is just and reasonable for PJM to assess penalties on Energy Harbor for capacity that Energy Harbor had no obligation to provide, and capacity that PJM had approved well in advance for it to be unavailable. The answer to that question is no. The tariff language is clear that the extent of a generator's unavailability due to an approved maintenance outage should not be included in the calculation of a performance shortfall, and that's what Section 10AD of Attachment DD of PJM's tariff provides. The 300 megawatts that were unavailable at SAMUS Unit 6 due to a maintenance outage, so the scheduled removal from service that PJM approved a month before the winter storm that led to the assessment of penalties should have been- Let me ask you a preliminary question, Ms. Wu. Does the PJM system of assessing an energy resource's capacity commitment depend on an unforced capacity? In other words, is it the same kind of system that the New York ISO uses as described in Keyspan Ravenswood? You know what I'm talking about? The uncommitted capacity and the overall maximum output of the facility is relevant when a facility is bid into the market, and this is the capacity market, and this is the market where PJM can approve and then subsequently commit generation to provide when called upon three years down the road. Once that capacity is cleared and committed into the market, the relevant portion is the committed portion of the capacity. And in Energy Harbor's case for the SAMUS facility, the SAMUS facility was comprised of three generating units. They were individual and separately operated, but they were bid in as a combined resource. It had a total maximum output of 1,490 megawatts. So can I, on a normal day, the SAMUS plant would attempt to meet its expected performance by calling on any of that 1,490 megawatts, right? That's correct. And that is because the way that the plant is operated is that of the 1,490, 1,036 was the actual committed capacity. That is the obligation that Energy Harbor had for the market, and that's what it was compensated for. And so when Energy Harbor operated the unit, it's now since been retired, it operated under the goal of providing 1,036 to the market. But I guess your yes answer to my question means that with a 300 megawatt planned outage, you could have met the expected performance on during all the relevant performance intervals, correct? That, when you look at the resource, the facility as a whole, as an aggregate. As a practical common sense. Sure. If you didn't have another problem with the planned outage, you would have met the expected performance. That's right. But the tariff provision that applies here is specific to the resource on which the capacity resource is based. And some of that. If we put, and I appreciate, obviously we'll pay attention to the text. If we just step back, the fundamental question about your position is why? Why would PJM give you a credit if you could have met a credit based on your planned outage? You could have met the expected performance. Sure. And in requesting an outage, submitting an outage ticket for the 300 megawatts that were going to be unavailable due to this maintenance that needed to be performed, PJM authorized that outage. And to us, the obligation to supply power is reduced by the amount that is taken offline and made unavailable due to the maintenance outage. How is that consistent with the tariff amendment, which refers, or I guess it's the tariff which refers to, applies, oh, the tariff amendment only applies to the extent that a capacity resource is unavailable solely because of a maintenance outage. So once you have another outage, a forced outage, then it's no longer applicable because it's not solely because of the approved, pre-approved maintenance. Thank you. And I think the interpretation turns on how the word resource should be interpreted. And when we look at the language, the term resource refers, it should refer to the generating units individually. That's not what the way the capacity contract was written. It doesn't specify, there's not one for six and one for unit seven and one for unit eight. It's for the aggregation. That seems like that should be dispositive of that point, that they're not contracting for capacity from three different. Yes. And the contract is for the megawatts that are reflected by the resources. But when we go back to the language, though, the language is the resource on which the capacity resource is based was on a generator maintenance outage. And I think that's where the operational, the way the outages are submitted, requested and approved by PJM, I think that's where that informs and actually necessitates an interpretation that the resource should be at the generating level as opposed to the So you said that because the outage is described, submitted and requested, the maintenance request for approved maintenance is described unit six, that should be read into the tariff and should supervene the language of only to the extent that a capacity resource is unavailable solely because? I think that the manner in which an outage ticket is reviewed and approved should be considered when interpreting this tariff provision. An outage ticket has to be submitted for each generating unit individually. Energy Harbor cannot submit an outage ticket that covers two units. So let's say SAMHSA unit five and SAMHSA unit six was requesting authorization to go out on a maintenance outage. Separate outage tickets would need to be submitted for SAMHSA unit five and a separate outage ticket would need to be requested for SAMHSA unit six. And PJM is free to approve each or both. Can I ask, why does, even if you were right about what a resource on which the capacity resource is based, if you're right about what that means, how does that help you? Because the text says to the extent that the capacity resource is unavailable. And if we just go back to my very first question, the capacity resource is the whole plant's megawatts. That's right. They were, let's say they were unavailable to the extent of 300 megawatts. And it seems like PJM would say, yeah, that's exactly what we did. We didn't consider those. We knocked it off your installed capacity and we did the calculation from there. It seems like it doesn't get you where you need to go. And respectfully, when we consider the resource, the maintenance outage was specific to SAMHSA unit six. It took off 300 megawatts from being available to the market. And so our interpretation of this tariff is that the resource on which the capacity resource is based, so SAMHSA unit six, which is a resource that basically supports the SAMHSA facility, that unit alone had one maintenance outage. There were no other outages in effect at the unit. And so when you look at the generating, at the generating unit level, then the 300 megawatt exemption excusal reduction should apply for the performance shortfall for the capacity resource as a whole. I understand that argument. And the one other question I had was, it seems like there's a, maybe you can help me with this, but it seems like there's a disconnect between where you started, which is arguments that may or may not be right about the, it's on being unfair or improper to look at installed capacity instead of committed capacity. But that might support an argument that they should start their calculation from installed capacity. That's not what you requested. You requested full 300 megawatt deduction from the performance shortfall. So why do you get that? Sure. Yeah. And thank you for that question. Performance shortfall calculation turns on the committed capacity. When we look at the inputs to the performance shortfall calculation, the expected performance is based off of the committed capacity. The actual performance is just how the unit performed. But the whole premise, the performance shortfall, and actually the capacity market as a whole, the purpose of the performance penalties is to ensure that resources show up when they are called upon three years down the road. And so the. And that adequate maintenance is performed on them. That's correct. Investments in infrastructure. But that is to the, that is to the committed portion of the capacity. And not to the incoming portion of the capacity. Well, you say that, except that I thought you acknowledged at the outset that the concept of unforced capacity applies here. Basically, that the recognition of the capacity to actually contract in a capacity market is assessed in light of the history of performance of that unit. In other words, a brand new spanking, never, never failed unit would probably have a higher proportion of unforced capacity to total install capacity. And an old, you know, kind of rickety unit would have a lower. Sort of ceiling of unforced capacity compared to install capacity. And so I understand and it's compelling your argument that the capacity resource, the amount that's actually contracted into the market is, is the responsibility, but it's really underwritten by the unused capacity, isn't it? The excess capacity. Thank you. And I would still turn back to the fact that the performance shortfall and every, all of these calculations are all based off the committed capacity. This is the capacity. But the committed capacity itself is based off of the install capacity. That's correct. But, but the obligation that Energy Harbor had to provide was for the committed capacity and not for the remainder. And to your point about, you know, aging units, this is, this was an aging coal unit as well. And so once Energy Harbor received that capacity commitment for 1036, the way that it operated the unit, the units was, we will operate at 1036. We'll staff it appropriately. We'll make sure that all the inputs are there in order to achieve the 1036 that was contracted for. Great. All right. Thank you. Thank you. We'll hear from Mr. Kennedy. Good morning, Your Honors. Robert Kennedy on behalf of the commission. I guess I'll start with what I think is the key language of section 10 AD, which as you pointed out, Judge Garcia is the phrase solely because the provision operates to provide an excuse for non-performance to the extent of capacity resource, which is defined as megawatts from an existing facility are unavailable solely because of a maintenance outage. And you see in paragraph 26 of the complaint order here, the commission looked at it prospectively setting aside the 300 megawatts that were out of commission due to the maintenance outage. What did Energy Harbor have available to them? When winter storm Elliot commenced in the performance assessment interval started. And if you just do the math, they had 1190 megawatts available to them to satisfy their capacity commitments, which were just around a thousand megawatts. And more than enough to meet the reduced expected performance levels, which were leave 840 and 860 on the two days in question. So the commission looking at those numbers said, given what you had available to you, you should have been the balancing ratio that you talked about. Can you tell me what that is? Sure. So so it's a function. It's an input into calculating expected performance. And basically, as I conceptualize it, PJ will say, OK, here's your here's your capacity commitment, your 1000 megawatts that you contracted to provide that we're paying you to  We're going to cut you a break if the fleet as a whole is really only performing at 80 percent of its of its committed capacity, then we're only going to hold you to 80 percent of your capacity commitment when assessing penalties. Is that also calculated in five minute intervals? I I think it is. But it's it's conceptually it's a discount given to Energy Harbor based on the general performance of everybody.  All the. Yeah. Yeah. All the generators and I've seen the PGM region. So, again, the commission looked at those numbers and said. Given that what you had available to you, the shortfall couldn't be solely because of of the maintenance outage in their briefs. So that's perspective. You can look at the other way to in their briefs. Energy Harbor attaches a lot of emphasis on the phrase that maintenance outage megawatts shall not be considered in the calculation of performance shortfall. So you can just look at the shortfall numbers and see that the forced outages more than eclipsed the shortfalls in December 23rd. I believe the shortfalls range between 330 and 300 and 400 megawatts. Energy Harbor had a forced outage of 750 megawatts that entire day. And there's a similar story for December 24th, where the outages were between 80, the shortfalls, excuse me, were between 80 and 180. The forced outage rate started at 140, moved up to 375 around 9 a.m. And then from 11 to 11 at night, it was like five hundred and I'm not sure I'm following the point you're making. Just simply simply the the amount of megawatts that were enforced outage more than captured the the shortfalls. So you could you could you could count. You could draw. So as long as you're counting the forced outages first, they want to count the authorized maintenance outages first. And you are saying, no, no, you count the forced outages first. And that is the whole amount. Right. You look at what they had available and then and that's the end of the question. They had enough. You don't even need to get into the forced outages. If they had enough available, then putting aside the maintenance hours and necessarily those maintenance outage megawatts weren't the sole cause of any shortfall. But that's because you're counting them afterwards, whereas if their role, you would just you would reduce the. They view it, I'm sorry, committed capacity by that to start and just act like it's a smaller contract. Well, that's what I understand their position to be. And so that's why I ask it in terms of sequencing, which you. So what I what their position in generally have been is the 300. Well, it's just credit, period. If there's a maintenance outage, you get a deduction from your performance shortfalls. And that doesn't work in this situation where there's dueling outages. Because the tariff requires that the maintenance outage be the sole cause. And here there's forced outages. The argument about installed capacity versus committed capacity. They have not really. There was some discussion about today. They have never argued that you should do the math and start at committed capacity, subtract our maintenance outages and see how we performed. They've always just advocated for a straight credit of 300. Would it be a credit on the performance shortfall? A deduction from the performance shortfall? Would it be a fiction? The capacity was 1490 from which the 300 was deducted. All right. So if you're going to avoid double counting, then the balancing ratio would have to be applied to 1490. Well, the balancing ratio is just applied to your. It's not really double counting because it's just setting a level of expected performance. So you're just applying it to the committed capacity level. So they're getting the benefit. And maybe I should just step back and talk about committed capacity versus installed capacity. And PJM will clear up the details if I have misstepped here. As I understand it and as I conceptualize it, PJM in these markets, they're purchasing unforced capacity. And what that basically is is a cap on the generators. What they can bid into the market is sort of capped at their installed capacity, their maximum generation, reduced by their historic outage rate. So PJM buys them at that level. But they are depending on the reason that level is set is because this is the most critical situation, a blizzard, high demand on a holiday weekend. You want them to be able to call upon that cushion that's available to them to perform when they're needed most. I mean, they've been paid all year to show up on this date. So you want them to be able to access that. And as you saw, they counted on the entire facility to meet their commitments. The reason that's correct is because that is the premise of the unforced capacity. And it's going to, am I right? I mean, it's going to vary depending on the historic performance of a plant. And you might be willing to buy some capacity from an older rickety or plant as long as it's got a bigger cushion. That's right. Behind it. Yeah, it serves kind of from PJM's perspective, it's a cushion that it can it'll have this gap so that the generators can use to perform. It's also an incentive to the generators. If you're capped at bidding your unforced capacity, you want to reduce your outage rates so you can actually bid in more and make more money. And are these plants, are they doing capacity contracting and they're also doing same day real time? Yes. So they're sort of two separate things. You get a capacity, there's a capacity auction three years ahead of the commitment date. You get paid during the delivery year just for having received the capacity award. Then you bid into the bid into the energy markets and sort of getting how that relates to the unforced installed capacity. There is, which PJM references in their brief, there's a must offer requirement that you have to offer into the day ahead energy market, the installed capacity equivalent of your unforced capacity. So you have to go beyond your commitment, I guess basically multiplied by the historic. Sorry, let me step back. You have to offer more than your committed capacity into the energy market every day to fulfill your commitments. And you can see that at 271 of the joint appendix. As for the argument that you should look at this at the resource level and apply it, I think that's contradicted both by the language of section 10 AD and the record. You mean 6, 7, and 8 when you talk about the resource level? Yes. Yes, that as long as you have an outage at one unit, that's enough. So section 10 AD focuses on the, excuse me, the unavailability of the capacity resource, which is defined as the net megawatts of capacity from an existing facility. So that's essentially its maximum output installed capacity. Then it directs you to look at the whether the unavailability of the, sorry, then it directs you to look at the resource on which the capacity resource is based. So how did Energy Harbor tell PJM that it was going to provide these net megawatts of capacity? And I think the record is undisputed. And certainly there's substantial evidence supporting the commission's conclusion that Energy Harbor treated this as a combined resource. You look at the layman affidavit, which they submitted in connection with their complaint, paragraphs 9 and 10, J189, 190. They said, we entered into the market as a combined resource. It received an award as a combined resource. It had an obligation to perform as a combined resource. How did PJM treat it? You can see this in paragraph 64, I believe, of the, sorry, footnote 64 of the commission's order. It recounts that PJM assigned a single resource identification number to the CMS units 5 through 7 when tracking performance throughout the winter storm Elliott. So everyone understood before the dispute arose that the resource that was supporting the capacity resource was the combined facility. And sort of accepting the analysis that Energy Harbor advocates for now sort of, it really results in, it's not symmetrical. Expected performance is measured on a combined basis. Actual performance is measured on a combined basis. So if you just peel out and look at the maintenance outage on a resource by resource basis, it gives the exemption an outsized influence on the math, and that's really contrary to the whole purpose of these revised rules, which were intended to restrict exemptions and put the risk of nonperformance on the generators rather than the consumers. Are you relying at all on any kind of deference? So we do think that the commission is entitled to deference in interpreting jurisdictional contracts. We think that, excuse me, that possibility survives. Loper-Bright, the court has recognized in the Kansas City's case, the national fuel case that we cite in our briefs that predate Chevron that the agency's expertise in dealing with jurisdictional contracts, I mean, the commission reviewed and approved this, particularly something as technical and, you know, in the weeds as the capacity markets and exceptions of capacity markets rules, the general... Do you need deference? I don't think we do. I think we have the best reading, period. The only reading that gives effect to all the pertinent terms in the contract. So I don't think we need it in this case, but I think it is available to us. Any other questions? Thank you, Your Honors. Thank you. Now we'll hear from Mr. Sweres for PJM. May it please the court. My name is Andrew Sweres from the law firm of Wright and Talisman, representing the intervener, PJM. I guess I'll take the easiest question first. Judge Randolph, you asked whether or not PJM does this calculation for every five-minute interval, and the answer is yes. Not by hand, I trust. Excuse me? Not by hand. Oh, no, no. No, in fact, if you look at the actual programming, which is in, I think it's in the petitioner's reply brief, you can see the actual programming that goes into the computer that calculates this. I think – well, let's start off with the generator ticket, which Ms. Wu talked about, and I believe she said that it takes 300 megawatts of capacity away from what's available to the market. I think the generator, if we just look, it's JA97. The outage ticket does not indicate what the committed capacity is. It says the ticket reduction is 300, installed capacity 600. So what is happening when a resource or a generator gives PJM a request of maintenance outage, what's happening is the available capacity to generate is reduced by that number. So here, their available capacity was 1490. It was reduced by 300 megawatts. That's the amount of the maintenance outage, and they clearly had more than enough megawatts available, even with that, as you recognize, Judge Garcia, that they could have met their capacity commitment. The capacity commitment is a commitment. They're paid a capacity payment every day of the year, even the days where they don't actually perform, in order to be available to stand by and provide those megawatts. If a forced outage accounts for some but not all of a shortfall, then the shortfall can be partially excused by a maintenance outage or no? If the forced outage counts for some but not all, I would say the answer to that question is yes. That the maintenance outage could be? The maintenance outage could be, again, to the extent that it is the sole reason for the outage. For the remaining portion. Right, right. Right, and so if they hadn't failed, then they would have met their commitments. If they hadn't had a forced outage, they would have met the commitments, notwithstanding the fact that they were on an approved maintenance outage as well. Absolutely. That's absolutely true. If there were not forced outages, they would have been able to supply that entire capacity commitment with the available generation. And that, I mean, they make this, I think, intuitively very powerful argument that the only committed capacity is, you know, only the committed capacity is what they're obligated for. And your position, I mean, we had discussion with both Ms. Wu and Mr. Kennedy about this, the notion that the entire installed capacity is really implicated in a capacity resource. Your understanding, Judge Pillard, is exactly correct. They, when they bid into PJM, they are bidding in an amount of megawatts. That amount of megawatts is backed by physical generation. The distinction, and you pointed to the Keyspan Ravenswood case, Judge Tatel there did a very good job of explaining how you get from installed capacity to unforced capacity and why you need to do that. And it's because no piece of equipment is running perfectly 100% of the time. And that's, but that's a different system operator. And so the citation for this, I take it would be the 2024 FERC order that accepted PJM tariff revisions. I mean, that's a one place I saw it just publicly that it's describes how the tariff entitles PJM to the complete physical capability. It's like you didn't actually spell this out that much in the briefing. If you would like us to find the site, we could. It wasn't implicated in the briefing at all, so. We're going to have to write something. Okay, we can. And I think it's, I mean, I'm persuaded that it is the routine operation and understanding of the parties, but. Right. So, so in order, in order to, you know, supply any amount of megawatts to PJM, you have to back that by a physical resource. And when you tell PJM that you're going on a maintenance outage and PJM approves it, PJM is saying, okay, we recognize that your ability to generate megawatts is reduced by the amount of that reduction. The extent to which that implicates your capacity commitment is what's at issue here. And if it's the sole reason that's, you know, that's one aspect of it. Then we need to see, well, to what extent does that reduction in installed capacity, the capability to generate, to what extent does that actually feed into your committed megawatts? I think you were about to suggest that we don't even need to get into this intricacy of how you get from installed to committed capacity. And if you were, could you just explain why that is? Well, the only reason why that issue, I think, comes up is because it is Energy Harbor's position that the calculation needs to start with the committed megawatts, and it is not relevant at all what the installed capacity is. And it is relevant, and that's why. I mean, I think that what's interesting about this case is so much of the facts, so many of the facts are completely undisputed, right? There are clearly multiple outages affecting the SAMIS resource. The SAMIS resource bid in as an aggregate resource, as both Judge Garcia and Judge Energy Harbor has conceded that the 300 megawatts were included in the calculation. They just don't like where we included them. And they even concede that every other aspect of the calculation, as was also recognized in the argument earlier, every other aspect of this calculation is done on an aggregate basis. So from PJM's perspective, what really matters is the amount that you are committing to the market, and can you meet it? You're making that commitment, and we don't really care whether you run SAMIS-5 and SAMIS-7 flat out and run SAMIS-6 just a little bit, or you run them all at 50 percent. That doesn't matter. And so because we haven't disaggregated the calculation in any other way, it would be incongruous to disaggregate the calculation for the one reason to determine whether it's the sole outage for a particular unit in that calculation. So the balancing ratio is per event, right? Per need for the capacity across PJM. They apply a balancing. We've had to rely on capacity contracts to meet the energy needs of the consumers because of winter storm Elliott. And in deciding who to penalize, there's the balancing ratio as is done off the top, basically. Nobody was able to operate, or across the fleet, there was, what, an average shortfall? I think the way PJM would express it is that, okay, so the balancing ratio applies to the expected capacity. And the expectation is… System-wide capacity. Fleet-wide, yeah. Right. And so the expectation for their megawatts is discounted, for lack of a better word, by the overall percentage of the fleet that PJM needs to call on at that interval. Is it an average? Or it's just… So PJM has contracted for… It has 100% of capacity contracts all together. And it says this storm was an 85% serious storm. In other words, it required us to draw an 85% fleet-wide. And so we're not going to pretend, with respect to Energy Harbor, that it was an emergency that required us to draw on 100% of their resource. So it's basically… It was enough to feed the customers to use 80% of our aggregate capacity that we had contracted for. Yeah, I think that's right. So it's not about… Unlike unforced capacity, which is about failures, the balancing ratio is about need. The balancing ratio is what PJM called on. It's a measure of the percentage of the available resources that PJM ultimately needed to call on to meet this emergency. Got it. All right. Thank you. Thank you. And I think, once again, we managed to question you and keep you up at the podium longer than your allotted time, but we'll give you a couple of minutes if you want it for rebuttal. Yes, thank you, Your Honor. I just have a few short points to make. Your Honor, you had asked about deference. Our position is that it should be limited, and the reason for that is because the… It should be what? It should be more limited. So a review of the tariff language here does not require technical knowledge. It doesn't require industry knowledge. It doesn't require the expertise that FERC would have to offer. As counsel for FERC actually acknowledged, the interpretation can be based off the language that is in the tariff. I did also want to respond to… Maybe more concrete about where you think a non-deferential approach would make a difference for your client. Well, in our opinion, the tariff language is clear, and it should be just based off of plain language of the tariff. We believe that the order was a conclusory in finding that the resource should be the SAMHSA facility because it ignored basically the operational realities of the facility. It ignored the fact that the outages are requested and approved on a generating unit level. And so this case is about an interpretation of basically a contract. And so while FERC's interpretation may be entitled to some deference, really the interpretation of the language at issue here doesn't require the technical knowledge and expertise that FERC has to offer. Okay. The second point I just wanted to respond to is, Your Honor, you had asked about paragraph 26 of the FERC order, JA189. And in that paragraph, it said, this exemption applies only to the extent a resource on which the capacity resource is based is on a generator maintenance outage. And the resource was unavailable solely because it was on such an outage. And it goes on to find that the maintenance outage was not the sole cause of the inability to meet the expected performance. So this seems to suggest that if a unit had both a forced outage and a maintenance outage in place, then it would not be eligible for the exemption under Section 10AD. But in FERC's brief, FERC offers an example that indicates somewhat of a contrary position. And this is the example that, Your Honor, you were asking about. And that is that even if a unit had a forced outage and a maintenance outage, in the example that they provided on page 33 of its brief, that unit would be penalized for the forced outage, but not for the maintenance outage to the extent that that maintenance outage covered the remainder of the performance shortfall. So I just wanted to note that because it appears to be a shift, a slight shift in the position. That seems consistent with the position as stated today. As stated today, yes. The inconsistency is between that and the order? Yes, in the order on the complaint. And that's in paragraph 26, where they say... I'm sorry, what's the inconsistency? Sure. So the FERC order says that the exemption applies to the extent that the unavailability is based solely on the generator maintenance outage. And then it goes on to find that the maintenance outage was not the sole cause of the inability to meet its expected performance as the tariff requires. So when I read that, it seems to suggest that if there is a maintenance outage and if there's another outage in place, regardless of how it is applied to the performance shortfall, then Energy Harbor would not be eligible for the exemption. I'm understanding them to be looking at increments of outage and that the ultimate increments after the forced outage that were unavailable were unavailable solely because of the maintenance outage, and that's why those would not be penalized.  Thank you, Your Honor. Okay, great. Thank you. May I make one more final point? I just want to reiterate that Energy Harbor bid in the full output of the SAMHSA facility. What it was committed... The capacity commitment that it had was a portion of that full output. Energy Harbor was not paid for the full amount. The amount that it was paid for and that it had an obligation to provide is the 1036 that we have been discussing. PJM says your committed capacity was calculated based on the installed capacity that you bid in. Do you dispute that? The committed capacity is basically what clears. There's a market clearing price and all the units are cleared based off that level. So, yes, the committed capacity is a portion of the installed capacity, but our position still remains that the committed capacity is the relevant portion that needs to be... I understand them to say that when they decide how much committed capacity to accept, require, pay for, they do it in reliance on the installed capacity and a calculation based on your historical forced outages. Do you dispute that?  Thank you. And so, in closing, if PJM provided prior approval for a resource to go out on a maintenance outage, that resource just should not be penalized for the unavailability. Thank you. Thank you. Case is submitted.
judges: Pillard; Garcia; Randolph